BOLIN, Judge.
This is a suit brought for rent under an alleged verbal contract of lease between Samuel R. Morgan, Jr., and Agricultural Enterprises, Inc., covering a warehouse known as Municipal No. 2465 Texas Avenue, Shreveport, Louisiana. Defendant had been occupying the premises under a written contract of lease since October 18, 1955, but prior to its expiration, negotiations were begun between the parties for certain alterations, additions, etc. Plaintiff alleges that a definite oral lease agreement was entered into on or about August 15, 1956. This contract, which was rather loosely referred to as the “Dargan Agreement” throughout the trial, is alleged by plaintiff to provide as follows:
“(a) Defendant leased the premises for warehouse space for the storage of defendant’s cotton and other agricultural commodities.
“(b) That the term of the lease and the rental stipulated was:
“(1) Erom September 1, 1956, to March 1, 1958, a period of 18 months, at $500.00 per month; and
“(2) From March 1, 1958, to March 1, 1960, a period of 24 months at $500.-00 per month; and
“(3) From March 1, 1960, to March 1, 1963, a period of 36 months at $750.-00 per month;
thus the entire term of the lease was for the period September 1, 1956, to March 1, 1963; all monthly rentals were stipulated to be paid on the first day of each month during the entire term of the lease.
“(c) Defendant agreed to pay all taxes assessed against any movable property placed in or attached to the leased premises and all ad valorem taxes assessed against the leased premises itself by the taxing authorities for the State of Louisiana, Parish of Caddo, City of Shreveport, and any school district and subdivision thereof.
“(d) Defendant agreed to maintain and repair the premises subject only to the ordinary wear and tear of a reasonable use.
“(e) Defendant agreed to insure the premises against loss due to fire, windstorm and extended coverage in the amount of $60,000.00 and to pay the premiums on such insurance policy during the entire lease.”
Defendant occupied the premises from October 15, 1955, to about March 15, 1959, but denies that any such contract as alleged existed. Defendant contends that its occupancy of the premises was based on the following series of contracts and month to month tenancy:
(1) Original rent contract dated October 18, 1955, for a primary term of 18 months at a rate of $625 per month with an option to renew for a second 18 months period. At the end of the 36 months, lessee had the *337 option to buy for a consideration of $60,000 payable under certain terms. Lessee was to pay all ad valorem taxes and provide insurance up to $60,000, but the obligation was limited to a cost of $1,000 per year to defendant. This contract covered only a portion of the warehouse facilities.
(2) On January 22, 1956, an additional part of the premises was added to the original contract by written agreement. This provided for a term of 18 months from December 1, 1955, to May 31, 1957, at a rental of $125 per month with the option to renew for an additional 18 months for the same rental. The lessee was to pay all ad valorem taxes. The lessee had the option to purchase at any time during the lease for a consideration of $4,500.
(3) Contracts (1) and (2) above were superceded by an oral contract in August, 1956, covering all the property for a period of 18 months commencing September 1, 1956, for a rental of $350 per month.
(4) Commencing March 1, 1958, there, was a lease contract for $400 per month for six months for which the rental was prepaid.
(5) From September 1, 1958, the defendant occupied the premises under no contract for which it paid a monthly rental of $500 per month.
In the alternative, defendant contends that if the court should find a contract existed between the parties other than as contended by defendant, such contract contains a provision permitting defendant to cancel the lease upon six months notice, said notice having been given.
The trial judge found that there was in fact a contract as alleged by the plaintiff and awarded judgment in his favor for the rent due and to become due under the terms thereof, subject to certain credits in favor of defendant. The judgment also recognized plaintiff’s provisional seizure on a certain sprinkler system located on the premises and owned by a third party.
Appellant complains of certain specified errors in the judgment as follows:
(1) In holding that the one page of the “Dargan Draft” constituted the contract between plaintiff and defendant;
(2) In failing to hold that any contract which existed between plaintiff and defendant was terminated by April 15, 1959, in accordance with its own terms;
(3) In failing to hold that plaintiff’s seizure of the leased premises and excluding the defendant therefrom terminated the lease and cut off any claim of plaintiff for further rent; and,
(4) The judgment of the lower court is contrary to the law and evidence of the case.
The principal .issues presented to this court are:
(1) Did the parties consummate a contract of lease?
(2) If so, what were the terms of such contract ? »
(3) In relation to such a contract, if found, did the introduction of the whole of the “Dargan Agreement” bind plaintiff to all of its terms?
(4) Did plaintiff terminate the lease when he, through his agent, locked the premises to prevent removal of the sprinkler system ?
The testimony in this case was in conflict and at wide variance but this is to be expected since the testimony covered conversation and events over a considerable period of time. The record contains numerous items of correspondence, many of which are pertinent to the inquiry we must make. While it tends to make this opinion rather tedious to digest, we feel it necessary to comment on many of these items because the decision herein is predicated to a large extent upon the intent of the contracting parties as gathered from such evidence. The plaintiff and defendant introduced a total of approximately seventy-five exhibits during the trial, and the transcript *338 of the oral testimony was voluminous. The various exhibits were not introduced in chronological order. In his written reasons for judgment the trial judge gave a detailed analysis of the negotiations surrounding this controversy, which we feel are as brief and accurate as possible. The sequence of events as shown by our learned brother below are:
“Exhibits D-22 and P-1, dated October 18, 1955, constitute an offer by the plaintiff to the defendant to lease certain property; this offer was accepted by the defendant. The lease was for the term of 18 months at $625 a month, with an option to renew for 18 months, and an offer to sell at the end of 36 months for $60,000.00.
“On January 20, 1955 (D-23) the ‘vault’ was added to this property for 18 months. The period of the lease was from December 1, 1955 to May 31, 1957. The monthly rental was $125, with an option to renew for an additional 18 months, and an option to the lessee to purchase the property for $4500. This exhibit was signed by Lide, his signature was struck out, and the document was not returned to Morgan.
“As a result of these two documents, and the negotiations which led to them, the plaintiff leased to the defendant certain premises for the amount of $750 a month, with either an offer to sell or an option to sell for $64,500, and an option to renew the lease for 18 months.
“A letter dated March 31, 1956 (D-33) from S. R. Morgan, Sr. to Lide, contained various proposals in response to a request to renegotiate the lease.
“In August, 1956 Leon Dargan, a lawyer from Texas representing Lide, visited Morgan.
“Exhibit D-17, dated August 25, 1956, was a letter from S. R. Morgan, Sr. to Lide relating Morgan’s understanding of the existing agreement between the plaintiff and defendant: $500 a month for 24 months, and ‘then back to $750.’
“Some correspondence from Lide follows, with no contradiction to the terms contained in Morgan’s letter.
“A letter dated January 16, 1957 (D-16), from Lide to S. R. Morgan, Sr., refers to their ‘Amos and Andy contract,’ and notes it is a far cry from the original contract, with amendments tacked onto amendments, and expressed a desire to convert the agreement to something else.
“A letter dated January 22, 1957 from Morgan, Sr. to Lide, refers to ‘rent check for January for $350’ as being received.
“Exhibits P-7 and D-15, dated August 21, 1957, contain a letter from Lencses to Morgan, and Morgan’s reply on the same sheet. Lencses wrote that the accountants wanted a certification of $750 prepaid rent, and amounts held by Morgan as payments from subtenants. Morgan recapitulates the transactions. He admits that he held $750 under the original agreement as prepaid rent. He relates that the monthly rental was reduced in the latter days of August, T956 from $750 a month to $350 a month for one year, expiring August of 1957. Mr. Morgan recapitulates what he called the Dargan agreement: 12 months beginning September, 1956 at $350 a month; the next 30 months at $500 a month; the next 30 months (“returning to the original”) at $750 a month; with an option to purchase at $64,500.
“Mr. Lide’s reply to Mr. Morgan dated August 30, 1957 (P-5 and D-36) states: ‘Our records indicate the $350 was for 18 rather than 12 months; rental graduation date for the $500 being March 1, 1958. * * * Enclosing one page of a draft made in Shreveport by Leon Dargan, and this also agreed with my notations after the visit I had with you in the Shreveporter Motel, some time before Dargan’s meeting with you.’
“Exhibit P-6 is the one page of the ‘Dargan draft.’ It is a page of a multiple page printed lease form, with typewritten insertions showing the following terms: *339 September 1, 1956, 18 months at $350 a month; March 1, 1958 to March 1, 19.60, $500 a month; March 1, 1960 for 36 months, at $750 a month.
“On September 10, 1957 (P-30 and D-37), S. R. Morgan, Sr. wrote Lide, ‘We accept your agreement * * * repeating: We accept your set-up program’. These references were to the memorandum forwarded to Mr. Morgan by Lide in Lide’s letter of August 30, 1957.
“On November 30, 1957, Mr. Morgan again wrote Lide that he was ‘pleased to accept’ the Dargan memo, $350 a month until March of 1958, and then $500 a month.
“On December 10, 1957 (P-8), Mr. Lide wrote Mr. Morgan a business letter. On the bottom, in Lide’s handwriting, was a note: ‘P.S. I appreciate your explanation to Joe and me re L. Dargan visit with you last year.’
“On February 8, 1958 Mr. Morgan wrote Mr. Lide (D-7 and P-23), ‘As at present your commitment is for 24 months at $500 per month, followed by 36 months at $750 per month.’ Then the letter refers to conversations in which Mr. Morgan agreed to reduce the $500 rental to $400 a month for a 6-month period in return for prepayment of the rental for that period in advance.
“On March 14, 1958 Mr. Morgan again wrote Mr. Lide (P-16) and referred to the prepayment of rent for six months and the reduction from $500 a month to $400 a month for that six months’ period.
“The letter indicates that the defendant was not prompt in making the ‘prepayment’ ; $1200 had been received; Mr. Morgan was urging the payment of the balance.
“Mr. Morgan’s letter to Mr. Lide dated March 26, 1958 (P-17) contained another reference to the $100 a month reduction, acknowledged receipt of $400 for rent for June of 1958, and demanded $800 more by April, 1958 or reversion to the agreement for $500 a month beginning July of 1958 for a 20-month period, then moving to $750 a month for the remaining 36 months of the agreement. Mr. Morgan’s demands conformed with the rental amounts and terms set out in the one page of the ‘Dargan draft.’
“On April 21, 1958 Mr. Lide wrote Mr. Morgan (P-9), ‘enclosing the final $800 on the $2400 rental prepayment.’ There was no protest or argument in this letter about the terms recapitulated by Mr. Morgan in his letter of March 26.
“On August 4, 1958 (P-10 and D-2), Mr. Lide wrote Mr. Morgan, Sr., to request another meeting to recapitulate or change the contract. This letter was answered by Mr. Morgan on August 9, 1958 (D-14), in which Mr. Morgan said that there had been an agreement on the Dargan memorandum. Mr. Morgan repeated the $500 and the $750 terms.
“Mr. Lide again wrote Mr. Morgan September 10, 1958 and requested a meeting. Mr. Morgan answered the request on September 11th, but protested that he could not reduce the rent any more.
“In September or October of 1958 there was a meeting between Mr. Lide and Mr. Morgan, Sr., at which a Mr. McMillan attended. Mr. Morgan’s letter to Mr. Lide on October 8, 1958 (P-38) was a result of the meeting between Morgan, Lide, and McMillan. Mr. Morgan reported that there was no change in his side’s understanding of the terms of the lease agreement.
“There was oral testimony by Mr. McMillan and Mr. Lide that Mr. Lide and Mr. Morgan had agreed to cancel the lease at some time around the next April. Mr. McMillan testified that the parties seemed to reach the agreement about the termination of the lease easily, and with no argument or discussion.
“In view of all the testimony, written and oral, the Court is of the opinion that what Mr. McMillan heard was Mr. Lide notifying Mr. Morgan that he would vacate the premises in the following spring. This was a move that Mr. Morgan could not *340 argue about. He knew that there was a vast difference between an agreement to terminate the lease, and an intention to vacate the premises by the tenant. Mr. McMillan apparently misunderstood this portion of the conversation.
“The first written mention of a six months’ right to cancel the lease was contained in a memorandum dated October IS, 1958 (D-S and P-15), prepared by an accountant, Hinds, to Mr. Lide. The memorandum was apparently given to Mr. Morgan on November 6, 1958. On October 17, 1958 Mr. Lide wrote Mr. Morgan (P-14) giving Mr. Morgan six months’ notice to terminate the lease, effective April 15, 1959, ‘in accordance with the agreement reached between you and Leon regarding this.’
“On October 22, 1958 (P-39), Mr. Morgan wrote Mr. Lide that Lide’s letter of October 17 had arrived on October 22. Mr. Morgan stated that ‘no thought of termination ever entered my mind or that of Dargan (sic). I am at a loss to find how you could so interpret the lease.’
“On November 11th Mr. Morgan requested a copy of the Dargan agreement containing the cancellation clause to which Mr. Lide referred. Mr. Morgan was furnished with the 5-page draft of the so-called Dargan agreement only in February of 1959.
“The evidence is wholly insufficient to support the defendant’s contention that a six months’ option to cancel was ever agreed on by the parties to this lease.
“Both the original and the copy of the lease agreement were introduced. The original is marked D-24 and the copy is marked P-3. This purported lease agreement is on a form printed for Agricultural Enterprises, Inc. Typewritten information appears on pages 1, 2, and 4 of the agreement. Pages 3 and 5 have nothing typed in the bank spaces of the form. The description of the pi'operty appearing on page 1 is obviously the description of property other than that actually occupied by the defendant. The name of the lessor and the description of the property appear on page 1. Page 2 has typed on it the duration of the lease and the monthly rentals, referred to above. Page 2 was the one page of the draft sent, by Lide to Morgan, and accepted by Morgan as containing the term of the lease as finally agreed upon by the parties. It is to be noted that that page contains provisions that were not followed by the defendant, although it would have been advantageous to the defendant to rely on the provision concerning the payment of taxes on the property involved here.
“Page 4 of the ‘lease agreement’ makes a further effort to identify the property, contains an option to purchase, and includes a six-months’ cancellation clause for the benefit of Agricultural Enterprises, Inc., and for the benefit of Morgan, in the event Morgan obtains a bona fide purchaser for the property.
“Leon Dargan, who prepared this instrument, testified that the terms were the result of conversation with Mr. Morgan, Sr. on the occasion of his visit to Shreveport in August of 1956. Mr. Dargan testified that the lease as prepared by him was satisfactory to Mr. Lide, and that Mr. Dar-gan did not know why the execution of the lease was not completed. However, Mr. Lide testified that he was not satisfied with the provisions of the lease as prepared by Mr. Dargan, and that Mr. Dargan had failed in his mission. The cause of Mr. Lide’s dissatisfaction with Mr. Dargan’s instrument is not apparent. It is to be remembered that it was Mr. Lide himself who extracted the second page of the ‘lease agreement’ and forwarded it to Mr. Morgan, Sr., one year after Mr. Dargan’s visit to Mr. Morgan.”
The conclusion reached by the trier of facts with regard to the terms of the contract as he found them are stated in the following quote from his opinion:
*341 “From the practices of the parties Tiere involved, considering all the evidence as illustrated by the correspond•ence between the parties, the canceled checks, the expired insurance policies, etc., the Court concludes that the terms of the lease agreement between plaintiff and defendant were those set out in the second page of the Dargan ‘lease agreement.’ ”
We think that these conclusions are sup-ported by the record and are imminently ■correct. Therefore, we must now consider whether plaintiff’s action in locking the building terminated the lease by denying the defendant peaceable possession and was, therefore, a violation of a lease agreement under LSA-C.C. Article 2692.
In support of its contentions, defendant ■cites the cases of Lacour v. Meyer, La.App. 2 Cir., 1957, 98 So.2d 308, and Pirkle & Williams v. Shreveport Jitney Jungle, 2 Cir., 1932, 19 La.App. 729, 140 So. 837. A close examination of these cases, however, shows that they presented to the court facts and circumstances wherein the lessor committed such extreme acts as to effectively ■deprive the lessee of his peaceable possession of the premises. In the case at bar, the record shows that the actions by the lessor were not such as to disturb the lessee, but were taken only to protect the lessor’s security for rent under the con•tract.
The sole remaining issue is the consideration of defendant’s contention that the introduction of the complete “Dargan Agreement” by plaintiff bound plaintiff to ■all of its contents, thereby substantiating ■defendant’s alternative defense of a six months cancellation clause. The court a quo found that the alternative defense with regard to the cancellation clause was with•out merit as there had never been any ■agreement thereto. We can find no fault -with such holding.
We also find defendant’s contention that the plaintiff is bound by the whole of the document introduced is without merit in this case. The circumstances surrounding this introduction shows the complete document was introduced simply for the clarification of the allegations and defenses urged by both parties and this does not bring the action within the rule urged by defendant.
The judgment of the court below is, therefore, affirmed at appellant’s cost.
Affirmed.